UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

BRITTANY RIQUEL PATTERSON

CRIMINAL DOCKET

No. 19-27

SECTION: "J"(3)

## ORDER AND REASONS

Before the Court is a sealed *Motion to Suppress* **(Rec. Doc. 40)**, filed by Defendant, Brittany Patterson. The Government filed an opposition (Rec. Doc. 63), to which the Defendant replied (Rec. Doc. 55). The Court held oral argument on the motion on May 20, 2019. Considering the Motion, the memoranda, the record, and the law, the Court finds that the Motion should be **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

Patterson argues that statements she made on three different days to IRS Special Agents should be suppressed because these statements were obtained in violation of her Fifth Amendment right against compelled self-incrimination. Both the Defendant and the Government depend on memoranda written by the interviewing agents for an accounting of the events. Accordingly, the facts are agreed upon, just not their import, and the Court has concluded an evidentiary hearing is not necessary to resolve the suppression issue.

# I.    May 28, 2015

Although it is unclear exactly when Patterson became a target of an IRS criminal investigation, the Government admits she was a target before she was ever interviewed by Special Agents.[1] In late February of 2015, the IRS launched a sting against Patterson while she was running her own tax preparation shop out of an apartment complex. According to an IRS memorandum recording the sting, an "undercover shopper" went to Patterson's place of business, and Patterson instructed the undercover shopper to falsely claim someone else's child as a dependent niece so the undercover shopper could receive a larger refund.[2]

With this evidence in hand, on May 28, 2015, Special Agents Mark Nuss and Jason Boyles of IRS Criminal Investigation attempted to interview Patterson at her last known address.[3] After learning she had not lived there for eighteen months, Agent Nuss called Patterson and left her a voicemail asking her to call him back. At 10:13 a.m., Agent Nuss followed up with a text message introducing himself as an agent with IRS Criminal Investigation and asking Patterson to call him back. Patterson responded two minutes later in a text message: "I spoke with my lawyer and he said not to speak with anyone without him sorry." Agent Nuss responded, "When can we meet with you and your lawyer? And if you give me your lawyer's name I will contact him directly. And Phone number?" Patterson texted back asking if the

---

[1] Although the Government makes no mention of this in its briefing, the Government freely admitted this at oral argument.
[2] (Memorandum of Activity, 2.27.15, Rec. Doc. 40-6).
[3] (Memorandum of Interview, 5.28.15, Rec. Doc. 40-3 at 1).

investigation involved "Erin, . . . Cause I hardly did any returns with them this year and none of them had no criminal activity." Responding separately to Agent Nuss's inquiry into her lawyer's contact information, she replied her lawyer was only available by appointment and she would have to talk to him first. Agent Nuss then asked where he could drop off documents for Patterson. Patterson then called Agent Nuss and admitted to working for another tax preparation business that was under investigation. During the phone call she told Agent Nuss that they could drop off documents for her at her mother's house, and she provided that address.

The agents, wearing plain clothes, arrived at Patterson's mother's house at 11:06 a.m.[4] Once there, they learned that Patterson was not; they called her, and she arrived a couple of minutes later. After they introduced themselves and produced their credentials, Patterson invited the agents inside her mother's trailer home. Once inside, the agents issued an IRS Summons to Patterson, which ordered her to appear at the IRS's New Orleans office on June 10, 2015. They then read Patterson the IRS's standard statement of non-custodial rights:

> As a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses. In connection with my investigations of your tax liability (or other matter), I would like to ask you some questions. However, first I advise you that under the 5th Amendment to the Constitution of the U.S., I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceeding which may be undertaken. I advise you further that you may, if you

---

[4] *Id.* at 2.

wish, seek the assistance of any attorney before responding. Do you understand these rights?"[5]

Patterson indicated she did understand these rights by responding, "Yes." Patterson then turned to her mother and told her she was not afraid to speak with the agents because she had done nothing wrong. Patterson's mother sat on the sofa in the adjoining room for most of the interview.[6]

The Memorandum of Interview states the interview was conducted from 11:09 a.m. to 5:54 p.m., and the content of this memorandum confirms that the interview was lengthy.[7] At the beginning of the interview, Patterson gave the agents some biographical information. She revealed that after her second child was born she suffered from postpartum depression and that she was diagnosed as bi-polar schizophrenia in 2009. Patterson noted, however, that she is fine with medication, and she described herself as healthy.[8]

The interview then turned to questions about her work at three different tax preparation businesses: Pelicans Income Tax and Bookkeeping Service; Crown Tax Service, LLC; and No Limit Tax Refund LLC, the business Patterson owned and operated herself.[9] Patterson first told the agents about her work at Pelican, which

---

[5] *Internal Revenue Manual*, § 9.4.5.11.3.1.1., https://www.irs.gov/irm/part9 (last visited June 5, 2019) [hereinafter Manual]. The Manual requires agents to give warnings before both custodial and non-custodial interviews of suspects. "The custodial interrogation warnings track Miranda precisely, while the noncustodial warnings do not." Ian Comisky, Lawrence Field, & Steven Harris, *Tax Fraud and Evasion: Offenses, Trials, Civil Penalties* ¶ 15.02 (2019). Patterson has not contested that she was read her rights as the Manual instructs.

[6] (Memorandum of Interview, 5.28.15, Rec. Doc. 40-3 at 2).

[7] *Id.* at 1.

[8] *Id.* at 2.

[9] The Memorandum of Interview describes No Limit Tax Refunds, LLC as a "sole proprietorship." It is unclear whether Patterson properly formed a Limited Liability Company or she simply adopted "LLC" as part of the name for her business. *Id.*

4

lasted for only the first two weeks of February in 2015—Patterson prepared twenty-six returns while working there.[10] Patterson described many acts of fraud by her fellow employees at Pelican, telling the agents that her co-workers had changed names and state ID numbers on returns, inflated withholdings, and that her former boss had fled to Texas with taxpayers' refund money.[11]

Next, Patterson spoke about her employment at Crown. Again, Patterson made allegations of fraud against her employer, stating that Butler, Crown's owner, allowed people to misstate their income on returns.[12] Patterson stated she did not work as a tax preparer at Crown but instead mainly performed clerical work and referred customers to the business. The agents gave Patterson a spreadsheet entitled "2012 Returns Deposited to Crown Bank Account" and Patterson identified the returns of the people she had referred to Crown.[13] Patterson was also given photographs of Butler, Butler's wife, and Dana Alvarez, a tax preparer at Crown, to identify.

Finally, Patterson spoke to the officers about her own business, No Limit. Patterson stated she was the owner, sole tax preparer, and sole transmitter of returns at No Limit.[14] Patterson admitted that she falsified numbers returns in order to help friends and family receive inflated refunds. Patterson stated, "I made up income numbers for family members."[15] And, "I know people who are struggling and I tried

---

[10] *Id.* at 4.
[11] *Id.* at 3-5.
[12] *Id.* at 5.
[13] *Id.* at 6.
[14] *Id.*
[15] *Id.* at 8.

to help them get money."[16] The agents gave various documents to Patterson regarding No Limit for her to review with them. When she was given a spreadsheet entitled "Brittany Patterson 2013 Returns" she went down the list and wrote "FD" next to the people who claimed false dependents.[17] She did the same with a corresponding spreadsheet for Pelicans.[18]

Before the interview concluded, the agents asked Patterson for her current address. She told the agents she still lived at the address she had not lived at for eighteen months, and the officers replied they knew this to be false.[19] Patterson said she was living with someone and she refused to tell the officers the address. The interview ended.

In her affidavit attached to her motion to suppress,[20] Patterson avers that she was dizzy, anxious, and unable to think clearly during the interview because she was off her anti-psychotic medication and had not slept the night before. As she informed the agents, Patterson has been diagnosed with bi-polar schizophrenia. She states she was prescribed and was taking the anti-psychotic Seroquel in 2015, and that when she missed doses she typically suffered the same symptoms she says she suffered during the interview. Patterson also explains she did not sleep the night before because she worked the nighttime cleaning shift at Ochsner Hospital on May 27, 2015, and she did not take her two scheduled doses of Seroquel on that day because

---

[16] *Id.*
[17] *Id.* at 9.
[18] *Id.* at 10.
[19] *Id.*
[20] (Rec. Doc. 40-7).

the medication makes her tired and she needed to work late. In between her shift ending at 6:00 a.m., and the first phone call around 10:00 a.m., Patterson had to drop her sister off at home and ready her kids for school. Patterson also included a page from her medical file indicating she suffered manic episodes on April 6, 2015 and June 22, 2015.[21]

## II.    June 10, 2015

The IRS Summons required Patterson to appear on June 10, 2015, at 9:00 a.m. Patterson failed to appear on time, and Agent Nuss texted Patterson, "Good morning Brittany, are you coming in for your summons appearance?"[22] Patterson responded that she could not make it. Agent Nuss offered a new date and texted,

> I can authorize one extension on the summons but I need to remind you that the summons is a legal document. Please read the section entitled Enforcement of Summons. Failure to appear will result in an attachment and arrest. Since you've been fully cooperative, I don't want that to happen.[23]

Patterson responded, "Ok I will go see my lawyer today and let him know everything that's going on and I agreed to speak to y'all without him and I didn't know what a summons was and that I was ordered to speak with y'all again after I told y'all everything I know from a to z[.]"[24] In another text message following immediately thereafter, Patterson wrote:

> And I can't Give u what I don't have[.] [M]y files was tooken an destroyed and my computer is destroyed that's why I took out the time to sit with u guys and let u know[.] [N]ow u telling me I can b arrested cause I cudnt

---

[21] (Rec. Doc. 40-7 at 3).
[22] (Memorandum of Conversation, 6.10.15, Rec. Doc. 40-4).
[23] *Id.*
[24] *Id.*

make it and I took out the time to tell y'all what I know[.] I didn't know I was in trouble or under investigation so [my lawyer] will b contacting u today.[25]

Patterson and Agent Nuss then spoke in two telephone conversations regarding the production of documents by Patterson, and a new summons date of June 16, 2015 was set.[26]

### III.    June 16, 2015

The IRS Summons ordered Patterson to appear at the F. Edward Hebert Federal Building, room 1037. Once she arrived at the Hebert Building, she walked through metal detectors and past security officers to get to room 1037. She did not bring the nameless lawyer she had referred to in her communications with Agent Nuss; instead, she came alone. At the IRS's office she met with Agent Nuss and she was introduced to Special Agent Cary Davis. The Special Agents were not in uniform, but Davis provided her badge and credentials for Patterson's inspection. Unlike when Special Agents Boyles and Nuss had interviewed her at her mother's home, this time the agents did not read Patterson the statement of non-custodial rights, despite the Internal Revenue Manual's admonition that they do so.[27] It  appears that the agents did not advise Patterson of any of her rights; they did not tell her she could terminate

---

[25] *Id.*

[26] *Id.* at 2.

[27] The Internal Revenue Manual states that the statement of con-custodial rights should be given before any formal question and answer interview, regardless of whether it the interview subject has been informed of her rights previously. *Manual*, § 9.4.5.11.3.1. Regarding a subject of an investigation, "[d]uring subsequent contacts with the subject, the subject should be advised of his/her constitutional rights before questioning." *Id.* § 9.4.5.11.3.1.1.

the interview or that she could leave at her discretion. The interview took place in a conference room and began at 3:19 p.m.[28]

According to the IRS memorandum, the agents began the interview by giving Patterson a spreadsheet entitled "2012 Returns Deposited to Crown Bank Account," which Patterson had previously reviewed.[29] The agents asked her to identify the customers she had referred to Butler; she did so. Then, the agents gave Patterson client folders for tax year 2012 which had been summoned from Butler; Patterson proceeded to identify the false items in returns prepared by Butler and her former co-worker, Dana Alvarez.[30] The agents then gave Patterson print-outs of transmitted returns that Patterson had prepared for her No Limit Tax Refund business in 2014 for tax year 2013 and asked her to identify false items.[31] Patterson reviewed the print outs and identified approximately fifty-three false items in thirty-one returns she had prepared. She was asked to do the same with tax returns she had prepared for tax year 2014, both for her own company and for Pelican Income Tax, and she identified many more false items in tax returns she had prepared.[32] The interview lasted until 7:07 p.m.[33] Patterson was not arrested at the conclusion of the interview and was allowed to leave.

---

[28] (Memorandum of Interview, 6.16.15., Rec. Doc. 40-5 at 1).
[29] *Id.*
[30] *Id.*
[31] *Id.* at 5.
[32] *Id.* at 8-14.
[33] *Id.* at 1.

## STANDARD OF LAW AND DISCUSSION

According to the Fifth Amendment, no person shall be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. When a criminal defendant's self-incriminating statements are produced through interrogation in the custody of law enforcement, there is a presumption that the statements were compelled and should be suppressed unless a *Miranda* warning was issued prior to the defendant making her statements. *Oregon v. Elstad*, 470 U.S. 298, 306–307 (1985), *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In this case, the Defendant argues her Fifth Amendment and *Miranda* rights were violated in several custodial interrogations, and she invokes *Miranda's* exclusionary rule to preclude the Government from using her statements in its case in chief. There are shifting burdens in suppression hearings in deciding whether confessions should be suppressed. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). The defendant must make "specific factual allegations of illegality," and it is her burden to show she was under custodial interrogation when she made the admission at issue. *Id.* If that showing is met, it is the Government's ultimate burden to prove by a preponderance of the evidence that the evidence was not illegally obtained. *Id.*

Two conditions must be met simultaneously for *Miranda's* protections to be triggered: custody and interrogation. *Minnesota v. Murphy*, 465 U.S. 420, 431 (1984). There is no question that the agents subjected Patterson to interrogation. Nor is it contested that she was not read her *Miranda* rights.[34] Accordingly, whether the

---

[34] Agents did deliver a non-custodial rights statement. The Court gives no consideration as to whether this statement was an adequate substitute for a reading of *Miranda* rights.

statements should be suppressed hinges on whether Patterson was in "custody" at the time she made her statements. *Elstad*, 470 U.S. at 306–07. "In the paradigmatic *Miranda* situation—a person is arrested in his home or on the street and whisked to a police station for questioning," *see id.*, but a defendant may be "in custody" anywhere, even in his own home. *See Orozco v. Texas*, 394 U.S. 324, 325 (1969). A defendant is in "custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *New York v. Quarles*, 467 U.S. 649, 655 (1984). It is the latter test that concerns the Court today.

If there was no formal arrest, "[t]he initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal quotations and citations omitted). In determining whether a reasonable person would feel free to leave or not, courts and police officers consider a number of factors: "the location of the questioning, its duration, the statements made during the interview, the presence or absence of physical restraints during questioning, and the release of the interviewee at the end of the questioning." *Howes*, 565 U.S. at 509. The "subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011) (quotations and citation omitted). Since *Miranda's* custody determination is to be made using an objective standard, the Supreme Court has not typically considered whether a defendant is more susceptible to police pressure due to her subjective characteristics, such as her mental health. *Id.*

at 282-98 (Alito, J., dissenting). The youth of the defendant, however, is notably "a relevant factor to be considered, so long so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer." *Id.* at 277 (majority opinion).

The freedom of movement is not accorded 'talismanic power,' though, because *Miranda* is applied "only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). "The freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112–13 (2010). Once the Court finds an interviewee would not have felt free to leave, the Court determines whether the detention "sufficiently impair[ed] the detained person's free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Howes*, 565 U.S. at 510 (quoting *Berkemer*, 468 U.S. at 437).

Patterson argues her Fifth Amendment and *Miranda* rights were violated both because she was subjected to a custodial interview after she invoked her right to an attorney and because she was interrogated without being read her *Miranda* rights. She also argues her statements were involuntary. Patterson identifies several points at which the agents allegedly violated *Miranda's* prophylactic rule.

## I. May 28, 2015

### A.

The first alleged violation occurred when Patterson texted Agent Nuss that her attorney had told her not to speak with anyone without counsel and Agent Nuss

texted back, inquiring after her attorney's contact information. According to Patterson, upon declining to speak with the agents without counsel present via text message, the agents were required to cease all communication with her. She cites to *Edwards v. Arizona*, 451 U.S. 477 (1981) for the proposition. "[H]aving expressed his desire to deal with the police only through counsel, [the defendant] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85. But clearly the Supreme Court's holding in *Edwards* was limited to situations in which the suspect "invoked his right to have counsel present *during* custodial interrogation." *Id.* (emphasis added); *see also Montejo v. Louisiana*, 556 U.S. 778, 795 (2009) ("If the defendant is not in custody then [*Miranda-Edwards*] do not apply.").[35] The Supreme Court has "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'" *Bobby v. Dixon*, 565 U.S. 23, 28 (2011) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 182, n. 3 (1991)).[36] And Patterson was clearly not in the

---

[35] In fact, the Supreme Court has specifically rejected the suggestion that the principles of *Miranda* should be expanded to include the non-custodial interrogations of tax payers by IRS special agents. *See Beckwith v. United States*, 425 U.S. 341, 345 (1976).

[36] Patterson fails to give justifications for why the rule of *Edwards* should be expanded to prohibit further questioning when the right to counsel is invoked outside of law enforcement custody, and indeed, their presence. The Court notes that, at the very least, there are significant reasons, both particular to this case, and in general, for not doing so. To pick one, the Supreme Court has acknowledged that that there is a lessened concern that a suspect will be badgered into waiving her right to counsel in a familiar setting, where she has the ability to seek advice from friends, family members, and legal counsel, and clearly an "interviewee" not in custody may do that. *See Maryland v. Shatzer*, 559 U.S. 98, 108 (2010). Another is that the law enforcement officer in this case responded to the invocation of counsel with a request for the attorney's information so that he could contact the attorney. It would be a restrictive rule indeed that prohibits law enforcement from requesting via text or other impersonal communication the contact information of an attorney to whom the defendant has deferred questions. It seems extraordinarily unlikely to this Court that this substantial obstacle to law enforcement could ever be justified by the minimal number of involuntary confessions such a rule

custody of the law enforcement agents when she communicated with them by phone and they did not know her location or even her current address. Accordingly, this mention of an attorney is not a reason to suppress any non-custodial admissions the Defendant made to Agent Nuss on May 28, 2015 over the phone or later, in person.

### B.

Patterson next argues that the follow-up, in-person interview at Patterson's mother's trailer home was custodial and her statements must be suppressed because she was not read her *Miranda* rights. It bears repeating what the actual test for custody is in these circumstances. As formulated by the Supreme Court in *Thompson v. Keohane*, 516 U.S. 99 (1995), the inquiry is, given consideration of the circumstances surrounding the interrogation, whether "a reasonable person [would[ have felt he or she was not at liberty to terminate the interrogation and leave." 516 U.S. at 112 (internal quotation marks and footnote omitted). Once the court has reconstructed the scene from the facts, the test becomes an objective determination of whether the person interrogated was restrained to a level similar to that of a formal arrest. *Id.* Examining the facts the Court has described above through an objective lens, the Court concludes the May 28 interrogation was non-custodial.

First, it is obviously significant that the interview took place in the Defendant's mother's home, a location that undoubtedly qualifies as the Defendant's "home turf"; this cuts sharply against finding Patterson was in custody. *See United States v. Ollie*,

---

would prevent. *See id.* at 106 (finding the prophylactic rule of *Edwards* is only justified so long as its costs outweigh its benefits).

442 F.3d 1135, 1139 (8th Cir. 2006). Moreover, while a suspect may be in custody even in his own home, this was not an extreme case where a squad of armed police officers entered a suspect's residence early in the morning and proceeded to rouse the sleeping suspect before questioning him in his own bed. *See Orozco*, 394 U.S. at 325; *see also United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012) (finding custody where a dozen armed officers awoke a suspect in his bed at 5:30 a.m., and the officers handcuffed and identified the suspect, and monitored him when he used the bathroom or spoke on the phone), *United States v. Wittich*, 63 F. Supp. 3d 644, 651 (E.D. La. 2014) (finding custody where officers drove suspect from his home in the morning to his office and interrogated him in isolation as a dozen armed federal agents in bulletproof vests searched the building, and an FBI agent stated that no one was allowed to leave during the search).

Although Patterson urges she was "ambushed" at her mother's home, the facts do not support this contention. To the contrary, it was Patterson who called the agents back and chose her mother's address as a location where she could be given documents. When the officers arrived at this location, they learned from her mother that Patterson was not there. However, after speaking with Agent Nuss on the phone, Patterson chose to drive to her mother's home to meet the agents. Once there, she chose to let the agents into the trailer. After she was given her summons, the agents informed her of several rights she enjoyed as a non-custodial interviewee—notably, that the agents could not compel her to answer questions, that her statements could be used against her, and that she had a right to seek advice from an attorney before

answering a question. Patterson indicated she understood these rights and she chose to continue with the interview. Patterson's protestations that she lacked a choice in the location of the interview ring hollow. The record is replete with examples of the Defendant choosing the modes and locations of her conversations with the agents. This freedom of choice, exhibited in Patterson's decisions to first text, then call, then speak with the agents in person does not give the impression she was a suspect who had "no choice but to submit to the officers' will and to confess." *See Minnesota v. Murphy*, 465 U.S. 420, 433 (1984); *see also United States v. Cumberland*, 359 Fed. Appx. 519, 520 (5th Cir. 2010) (unpublished) (finding a defendant's freedom to drive himself to an interview was a factor weighing against finding custody).

Second, a chief concern of *Miranda* is that "isolation may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support." *Howes*, 565 U.S. at 512-13 (2012) ("[W]ithout any such assistance, the person who is questioned may feel overwhelming pressure to speak and to refrain from asking that the interview be terminated."). Here, Patterson's mother sat in the adjoining room during most of the interview. There is no suggestion that the agents prevented Patterson from speaking with her mother during the course of the interrogation. Such a nearby presence of a close family member weighs against a finding of custody. *Id.*

Third, Patterson does not suggest that her movements were restricted. She was not handcuffed, and she does not claim the agents told her she was not allowed to leave. *See United States v. Harrell*, 894 F.2d 120, 125 (5th Cir. 1990) (finding a lack

16

of physical restraints a factor in finding interrogation to be non-custodial). The memorandum of interview, which Defendant depends upon as an accurate history of encounter, does not suggest that she complained that she wanted to leave or that she was ever denied a break. Additionally, the interview concluded with the agents leaving the Defendant at her mother's house. This too suggests Patterson was not in custody. *See Cumberland*, 359 Fed. Appx. at 520 (agents leaving defendant in public park where interview had taken place weighed against finding custody).

Of the factors commonly employed to adjudge custody, only one weighs in favor of the Defendant: duration. The memorandum of interview indicates that the defendant was interviewed for approximately seven hours, from eleven in the morning to six in the evening. This is a long time to spend in conversation, and it is certainly a very long time to be interrogated by the police. *C.f. Berkemer*, 468 U.S. at 439 (finding the brief, roadside detainment of a traffic stop does not suggest custody). However, a lengthy interview does not render an interrogation custodial in the absence of the other elements of the paradigmatic *Miranda* case. One would reasonably wonder if they would be allowed to leave a police station after nearly a full work-day of interrogation that extends well into the evening, but this interview took place in the Defendant's mother's home, with the Defendant's car parked outside. Absent any suggestion that this home-visit interview continued for this length over the subject's objections, the sheer duration is not enough to find the defendant was in custody. *See United States v. Miller*, 587 F. Supp. 1296, 1300 (W.D. Pa. 1984).

The Court also agrees with the Government that it is appropriate to consider why the interview lasted so long. The law enforcement officers in this case were IRS Special Agents who were interviewing a suspect for the first time about her work at three different tax preparation companies over a period of years. The nature of the crimes investigated and their scope in length and breadth meant there was much to discuss. This was not a case where police officers hounded a defendant hour after hour with variations of the same questions all pertaining to the same singular event. The *Miranda* Court found that this type of redundant questioning—appearing endingless to the suspect and specifically intended to subjugate the suspect to the interrogator's will—was likely to produce involuntary confessions. *Miranda*, 384 U.S. at 456.

This brings the Court to a related point. Courts sometimes look at what was said in an interview, whether questioning was "accusatory or non-accusatory," *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015), and whether a defendant was confronted with evidence of guilt. *See Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir. 1978). In this same vein, the Fifth Circuit has suggested it is proper to consider "[t]he awareness of the person being questioned by an officer that he has become the 'focal point' of the investigation, or that the police already have ample cause to arrest him" because this "may well lead him to conclude, as a reasonable person, that he is not free to leave." *United States v. Bengivenga*, 845 F.2d 593, 597 n.16 (5th Cir. 1988). Patterson suggests that she was a target of the IRS's criminal investigation and the agents projected this fact by confronting her with evidence of her alleged crimes:

spreadsheets tracking returns and IRS forms Patterson had prepared which contain false information. This is another reason to find this interview custodial, she says.

The Court disagrees with this assessment. However this factor is formulated, it turns on whether a reasonable person would suspect they would be arrested if they stood up to leave because they can intuit from their treatment by law enforcement that they have become a prime suspect. Although it is true that the agents gave many materials to Patterson for her to review, some of which implied tax fraud on her own part, much of what she was given to review was indicative of fraud on the part of others. A reasonable person might have believed from the materials Patterson was given to review that she was viewed by the IRS as an important witness to tax schemes committed by her employers rather than as a target of the IRS's investigation herself. This assumption would have been reinforced by some of the actions taken by the agents during the interview. For example, when Patterson alleged Butler was allowing customers to file false returns, the agents gave her photographs of Butler, Alvarez, and Butler's wife (the alleged tax preparers at Crown), so that she could identify them. In fact, Patterson appears to have believed she was a mere witness because she texted Special Agent Nuss on June 10 that she did not know she was being investigated. This factor is, at best, a wash for Patterson.

In sum, a review of the Memorandum of Interview does not suggest that a reasonable person would view this lengthy interview as an interrogation without end or one that could not be walked away from. Accordingly, based on the appropriate factors, the Court finds that the Defendant was not in custody and the agents were

not required to advise Patterson of her *Miranda* rights on May 28. *See Beckwith v. United States*, 425 U.S. 341, 342 (1976) (finding *Miranda* warning was not required where IRS special agents met taxpayer in a home where he occasionally stayed, the taxpayer indicated he understood his non-custodial rights, and the interrogation lasted a couple of hours but proceeded in a "relaxed" manner). This finding is consistent with the great majority of opinions that have found at-home interrogations by IRS agents do not qualify as custodial. *See, e.g., United States v. Engle*, 458 F.2d 1017, 1021 (8th Cir. 1972) (finding at-home interrogation by IRS agents who did not detain the subject in any way to be a paradigmatic non-custodial interrogation), *United States v. Bachman*, 267 F. Supp. 593, 595 (W.D. Pa. 1966) (finding no custody where "the defendant was not under indictment or arrest, subpoenaed, or otherwise deprived of his freedom of action at any of the interviews; the interviews were investigatory, not custodial; the accusatorial stage had not as yet been reached; [and] whether a crime had occurred was still unresolved").

Patterson argues that "perhaps most significantly," she "had not slept the night before the May 28, 2015 interview, and she had missed her doses of Seroquel the day and night before, resulting in her not thinking clearly and feeling extremely anxious on the day of the interview."[37] In effect, Patterson asks this Court to take her subjective characteristics into account when asking whether a reasonable person would have felt free to leave the interrogation. So far, the Supreme Court has held that one plainly visible characteristic of suspects modifies the reasonable person test:

---

[37] (Rec. Doc. 40-1 at 12).

age. *See J.D.B.*, 564 U.S. at 281. Accordingly, it is appropriate for courts and police officers to ask whether, for example, a reasonable child of thirteen would feel free to leave an interview with police. Although Patterson does not delve deeply into this topic, the Defendant's implicit request is that *J.D.B.*'s reasoning be expanded so that other personal characteristics of the suspect are imprinted onto the hypothetical "reasonable person." The leap from the age to the other limitations of mental capacity, such as mental illness, is logical, *see id.* at 291-93 (Alito, J., dissenting), but Defendant provides no citations suggesting it is one that courts have been willing to make. Moreover, it is particularly difficult to accept that the transient characteristics of this defendant—her exhaustion stemming from her lack of sleep, her dizziness from not taking her medication the day before—should be considered relevant to the determination of whether she was in the agents' custody. To the extent the Defendant urges that law enforcement officers should proceed cautiously when interviewing suspects the officers know to be suffering from a serious mental illness, the Court does not disagree. But as *Miranda* and its progeny currently stand, Patterson's alleged inability to "think clearly"—unannounced to the agents interviewing her—is not a reason to find she was in the agents' custody.

## C.

Whether or not a suspect is *Mirandized*, a suspect's admission of guilt may be excluded if it was not given voluntarily; for this inquiry the personal characteristics of a suspect *are* properly considered. *See Muniz v. Johnson*, 132 F.3d 214, 220 (5th Cir. 1998). Nevertheless, even accepting that Patterson was groggy, dizzy, and lacked

clarity in her thinking on May 28, this does not necessitate the conclusion that her Fifth Amendment rights were violated, because the "sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). "Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.* (quoting *Elstad*, 470 U.S. at 305).

There is no suggestion that the agents in this case acted in an overbearing or dominating manner—the record demonstrates they acted with politeness and restraint. Patterson never informed the agents that she had not slept or that she was too tired to do the interview. She mentioned she had been diagnosed as suffering from bi-polar schizophrenia, but she also stated she was fine with medication.[38] Significantly, Patterson does not claim that she informed the agents that she was not currently medicated. "These facts, taken together, do not suggest a coerced confession." *Muniz*, 132 F.3d at 220 (noting *Mirandized* defendant who was arrested late at night and was held in a cell until the interview had not complained to officers of his fatigue or requested time to rest). There being no evidence of the "crucial element of police overreaching," the Court concludes that Patterson's May 28 statements were voluntary. *Connelly*, 479 U.S. at 163; *see also United States v. Hallford*, 816 F.3d 850, 860 (D.C. Cir. 2016) (finding interrogation of involuntarily admitted mental patient produced voluntary admission).

---

[38] (Rec. Doc. 40-2 at 2).

## II.   June 10, 2015

All communications between Patterson and the agents on June 10 were through text message or by telephone call. Accordingly, for the reasons given above, Patterson's out-of-custody reference in her text to her lawyer did not prohibit further questioning from Agent Nuss, and Patterson's constitutional rights were not violated on this date.

## III.   June 16, 2015

Then there is the July 16 interview at the IRS's office. Patterson was compelled to appear at the IRS's office in the Hebert Building that day by operation of an IRS Summons, the IRS's variation of compulsory process. Patterson argues that upon appearing at the IRS's office she was subjected to custodial interrogation and any statements she made thereafter are subject to suppression because she was not read her *Miranda* rights. As both Patterson and the Government frame it, the issue here, as above, is whether "there has been such a restriction on [Patterson's] freedom as to render [her] in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). A threshold inquiry, unaddressed by the parties, is what *Miranda* requires when the IRS compels a witness's testimony through the use of legal process.[39]

One answer is that by use of this legal process alone—thereby literally compelling Patterson to give her testimony—the agents were required to give Patterson a *Miranda* warning before questioning her. Such a per se rule makes sense

---

[39] The parties have not cited, and the Court is unaware of any case in which a court has considered the issue.

at a fundamental level. As a matter of policy, there would seem to be few circumstances where the clarifying effect of a *Miranda* warning would be more helpful than this one. The subpoena commands simply that the subject must give her testimony—there is no indication of a reservation of rights, no warning that the subject may refuse to testify to any incriminating statements. Without such a warning, it would not be unreasonable for a layperson to believe that this official document overrides a right to remain silent. Moreover, requiring a warning would not be much of a burden on the IRS: it is already the IRS's official policy to give a *Miranda*-lite warning before all formal question and answer interviews.

However, the Court thinks this possibility is foreclosed by Supreme Court's decision in *Minnesota v. Murphy*, 465 U.S. 420 (1984). When considering a parolee's invocation of *Miranda* upon being questioned by his parole office without warning, the Court held the "general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones." *Id.* at 427. Justice White explained:

> Murphy was in no better position than the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege and shows that he faces a realistic threat of self-incrimination. The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege.

*Id.* Like the state probation law at issue in *Murphy*, the IRS Summons "merely required Patterson to appear and give testimony," therefore, it cannot be said to have

compelled Patterson's testimony for Fifth Amendment purposes standing alone. *See id.*

Another possible answer is the opposite conclusion: that because the IRS used compulsory process, *Miranda* does not apply at all. An IRS Summons facially resembles a grand jury subpoena and, as *Murphy* suggests, the Supreme Court has demonstrated healthy skepticism at the idea that *Miranda* applies to uncharged witnesses compelled to testify before grand juries. *See United States v. Mandujano*, 425 U.S. 564, 580 (1976) (plurality opinion) (holding less than full *Miranda* "warnings volunteered by the prosecutor to respondent in this case were more than sufficient to inform him of his rights and his responsibilities and particularly of the consequences of perjury"). And the Supreme Court has explicitly connected the investigative function of IRS Summons with that of grand jury proceedings in *United States v. Powell*, 379 U.S. 48, 57 (1964). Moreover, as the Court so held in *Powell*, there is a check (although slight) on the IRS's ability to use compulsory process—a hearing may be held prior to enforcement to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* at 58.

But this answer—that the use of the Summons removes the interrogation from *Miranda's* scope—is not viable either. The Supreme Court has made clear that the civil-criminal hybrid nature of the IRS is not a reason for not conducting a custody analysis to determine whether IRS agents are required to deliver a *Miranda* warning

to an interview subject. *See Beckwith*, 425 U.S. 341, 347 (1976), *Mathis v. United States*, 391 U.S. 1, 5 (1968). Therefore, the answer must be—as the parties assumed from the beginning—that whether *Miranda* warnings were required depends on resolution of the standard custody test. *See Murphy*, 465 U.S. at 430 n.5. The use of the IRS Summons by itself neither required the agents to deliver *Miranda* warnings nor did it free the agents of the responsibility to warn Patterson if she was in custody. Accordingly, the Court turns to resolving whether Patterson was in custody. The first step in resolving custody is determining whether Patterson would reasonably have felt free to leave the June 16 interrogation.

The Court thinks the answer to this inquiry is obviously not. A review of cases in which defendants have argued for suppression of their incriminating statements made at the IRS's offices reveals two points. First, courts almost always find interrogations at IRS offices to be non-custodial, and second, courts have hinged this determination on the defendant's *voluntary* appearance at the IRS's office. *See, e.g.*, *United States v. Erekson*, 70 F.3d 1153, 1157 (10th Cir. 1995) (finding a reasonable person would feel free to leave an interrogation by IRS Special Agents where taxpayer came to the IRS's office voluntarily, he knew was not the "focus" of the criminal investigation at the time of the interview, and he in fact did leave freely afterwards), *United States v. Presley*, 478 F.2d 163, 169 (5th Cir. 1973) (voluntary appearance by taxpayer at IRS office with accountant was not custodial), *United States v. Brevik*, 422 F.2d 449, 450 (8th Cir. 1970) (interview non-custodial where taxpayer voluntarily appeared at IRS's office to provide documents and answer questions and was not

physically constrained in any way), *United States v. Venator*, 568 F. Supp. 832, 834 (N.D.N.Y. 1983) (interview at IRS office not custodial where appearance was by mutual arrangement, and there was no allegation nor any evidence that the defendant was restrained or coerced into remaining at the office).

Most recently, the Fifth Circuit considered a case where IRS Special Agents were surveilling a suspect and, seeing him stop his car before a stop sign, approached the suspect and asked him to follow them to the IRS's office for an interview. *United States v. McLean*, 369 Fed. Appx. 536, 537 (5th Cir. 2010) (per curiam) (unpublished). At the interview, the agents delivered the statement of non-custodial rights, told the suspect the interview would be terminated and he could leave if he asked for an attorney, and in fact allowed the suspect to leave in his own car afterwards. *Id.* at 537. The Fifth Circuit found it was not error to deny suppression on these facts. *Id.* at 537-38.

Patterson's appearance at the IRS's office on June 16 was obviously *not* voluntary. Agent Nuss explicitly informed Patterson the week before that if she did not attend she would be arrested. When Patterson missed her first summons date, he texted her on June 10, 2015:

> I can authorize one extension on the summons but I need to remind you that the summons is a legal document. Please read the section entitled Enforcement of Summons. Failure to appear will result in an attachment and arrest. Since you've been fully cooperative, I don't want that to happen.[40]

---

[40] (Memorandum of Conversation, 6.10.15, Rec. Doc. 40-4).

The IRS Summons Form 2039 is a simple document. Its command to the summoned individual is as follows:

> You are hereby summoned and required to appear before Special Agent Mark Nuss or his delegate[,] an officer of the Internal Revenue Service, to give testimony and to bring with you and to produce for examination the following books, records, papers, and other data relating to the tax liability or the collection of tax liability or for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning [Brittany Patterson and/or No Limit Tax Refunds] for the periods shown.[41]

Attached to the summons is a list of the materials to be produced by Patterson and a form listing relevant provisions of the Internal Revenue Code. Appearing at the bottom of this form is the "failure to obey summons" section Agent Nuss was referring to, section 7210 of the Internal Revenue Code. It states:

> Any person who, being duly summoned to appear to testify, or to appear and produce books, accounts, records, memoranda, or other papers, as required under sections 6420(e)(2), 6421(g)(2), 6427(j)(2), 7602, 7603, and 7604(b), neglects to appear or to produce such books, accounts, records, memoranda, or other papers, shall, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both, together with costs of prosecution.[42]

26 U.S.C. § 7210. Given this, Patterson cannot be said to have appeared voluntarily at the IRS's office, and the typical justification for holding IRS interrogations to be non-custodial is absent in this case.

Additionally, other ameliorative circumstances, generally present in typical IRS interrogations, were also absent in this case. Patterson was interrogated by federal agents until after seven in the evening on what is definitely the

---

[41] (IRS Summons, Rec. Co. 63-4).
[42] *Id.*

"Government's turf."[43] The length of the interrogation—over four hours—is, at the least, suggestive of custody. *C.f. United States. v. McNair*, 444 Fed. Appx. 769, 770 (5th Cir. 2011) (per curiam) (unpublished) (finding a less than two-hour interrogation not to be custodial per se). The June 16 interrogation was actually shorter than the May 28 interrogation the Court already found to be non-custodial, but duration should not be examined alone to determine custody. There were other factors present for the May 28 interrogation which suggested that although the interrogation went on for very substantial amount of time, it went on for that length because Patterson was content to keep talking. On that earlier date Patterson was interrogated at her mother's home, with her mother mostly seated only a few feet away, and it was Patterson's choice to meet with the agents and invite them inside. In stark contrast, on June 16 Patterson was interrogated in the IRS's office by the two Special Agents while she was alone. She did not appear of her own volition, she was *compelled* to appear by the IRS Summons. In fact, she was informed by the very IRS Special Agent who interviewed her that if she did not show up to give testimony, she would be arrested.

Furthermore, on May 28 the agents informed Patterson of her non-custodial rights. On June 16 the agents did not read Patterson the statement of non-custodial

---

[43] The General Services Administration describes the location of the interview, the F. Edward Federal Building, as "a large, modernistic, eleven-story limestone structure of approximately 244,000 square feet, constructed in 1939." General Services Administration, *F. Edward Hebert Federal Building, New Orleans, LA,* https://www.gsa.gov/historic-buildings/f-edward-hebert-federal-building-new-orleans-la (last visited May 30, 2019). As GSA notes, its design is typical of the austere Art Deco style that was popular for government buildings in the 1930s. *Id.* The building remains a "symbol of federal presence in New Orleans." *Id.* In other words, while the interview may not have taken place in the station house, it was conducted in a location designed with the intent to project federal power. It is a far cry from a neutral location.

rights before conducting the formal interview—in contravention of the Internal Revenue Manual; nor does it appear that the agents informed Patterson she could refuse to answer questions or that she could leave at will. The agents' decision to alert Patterson to her Fifth Amendment rights before one interview and not before the other is especially problematic in this case. As explained, the circumstances of the May 28 and June 16 interviews are entirely different—most notably the second interrogation was brought about by an IRS Summons compelling Patterson to appear to testify before the agents. A reasonable person might misunderstand that her right against self-incrimination was eliminated by the intervening IRS Summons; this belief would be reinforced by the Special Agents reading Patterson a statement of non-custodial rights on May 28 but not on June 16.

Finally, a reasonable person would understand they were a target of the IRS's criminal investigation after reading the IRS's Summons and Special Agent Nuss's text message, warning of arrest, as Patterson herself came to realize on June 10.[44] The IRS Summons explicitly narrowed the subject of the documents to be brought, and her testimony to be elicited, to Patterson and her own tax preparation company, not the other enterprises Patterson had merely worked for. During the actual interrogation the agents asked Patterson to identify the false items on returns she had helped prepare. Under these circumstances, no reasonable person, having been compelled to appear and being confronted with a stack of false returns they had prepared—now fully understanding they were a target of the IRS's criminal

---

[44] (*See* Memorandum of Conversation, 5.10.15, Rec. Doc. 40-4) ("I didn't know I was in trouble or under investigation . . . .").

investigation—would have felt they were at liberty to terminate the interview and walk away.[45]

Having found a reasonable person would not have felt free to leave, the only thing that remains to be decided is whether this is one of those circumstances where the *Miranda* court did not anticipate the prophylactic rule would be applied; situations such as: brief investigatory detentions, *Berkemer v. McCarty*, 468 U.S. at 430; interrogations of prisoners, *Howes v. Fields*, 565 U.S. at 511; or the appearances of witnesses before grand juries or in court, *United States v. Mandujano*, 425 U.S. at 579. Patterson's detention was far from brief and she was not accustomed to "inherently compelling pressures" as a prisoner would be, but the Court has already acknowledged that an IRS Summons resembles a grand jury appearance in some regards. Nevertheless, when placed on a continuum of cases where the prototypical stationhouse interview is on one end and subpoenaed witness testimony in a court

---

[45] The case Government relies upon, *Oregon v. Mathiason*, 429 U.S. 492 (1977) (per curiam), is distinguishable. In *Mathiason* an officer of the state police investigating a burglary left his card at the home of a suspect, Mathiason, and a note asking the defendant to call him because "I'd like to discuss something with you." *Id.* at 493. Mathiason was a parolee at the time. The defendant called, and the officer asked that they meet at a place convenient to the defendant; the defendant did not have a preference where they met so they met at the state police's patrol office, two blocks from Mathiason's home. The officer met with the Defendant and took him into an office before closing the door. The officer interviewed Mathiason from behind a desk. Before asking any questions, the officer assured the defendant he was not under arrest. The officer informed Mathiason he was a suspect in the burglary and falsely told him that they had found Mathiason's fingerprints at the scene. Five minutes into their conversation Mathiason confessed. The officer advised Mathiason of his Miranda rights, they taped a confession, and Mathiason was released—the officer said the DA would make a decision of whether to press charges. *Id.* at 494. All of this took less than thirty minutes. The Supreme Court found Mathiason was never in custody because the "respondent's freedom to depart was never restricted in any way." *Id.* at 495. First, Mathiason came to the interview voluntarily; second, he was immediately informed he was not under arrest; third, questioning took only half an hour; fourth, he was in fact allowed to leave after its conclusion. *Id.* Of these four reasons for finding no custody, three out of four are absent from this case. Patterson did not come voluntarily, she was compelled to on threat of arrest; she was never informed she was not under arrest or that she was free to terminate the interview whenever she wanted; and the interview proceeded for four hours.

room is on the other, the June 16 interrogation is much closer to the former than the latter. The Supreme Court commented on the "marked contrasts between a grand jury investigation and custodial interrogation" in *Mandujano*, 425 U.S. at 580. A plurality of the Court found it would obviously have been a significant extension of *Miranda* to hold that its rule required a warning prior to "questioning before a grand jury inquiring into criminal activity under the guidance of a judge." *Mandujano*, 425 U.S. at 580. As the Court acknowledged in the *Miranda* opinion, "the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." *Miranda,* 384 U.S. at 461.

Here, an official compulsion to testify was simply overlaid on the typical interrogation setting. There were no impartial observers and no courtroom setting. Rather, criminal investigators summoned a target of their investigation, whom they had already interviewed extensively and had amassed evidence against through a sting operation, so they could question her as to her own criminal conduct. There has been no hint that this is a situation which the Court did not intend for *Miranda* to apply. *See Beckwith*, 425 U.S. at 347.

Accordingly, upon consideration of the totality the circumstances, the Court finds Patterson was subjected to a custodial interrogation on June 16, 2019 without being read her *Miranda* rights, and the statements made during this interrogation should be suppressed.

## CONCLUSION

**IT IS HEREBY ORDERED** that the *Motion to Suppress* **(Rec. Doc. 40)** is **GRANTED IN PART** to suppress Patterson's in-custody statements on June 16, 2019 from being used in the Government's case in chief and is otherwise **DENIED**.

New Orleans, Louisiana, this 11th day of June, 2019.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE